```
Priority
Send
Enter
Closed
JS-5/JS-6
JS-2/JS-3
Scan Only
```

FILED - SOUTHERN DIVISION
CLERK, U.S. DISTRICT COURT

APR 2 1 2006

CENTRAL DISTRICT OF CALIFORNIA
BY                          DEPUTY

# UNITED STATES DISTRICT COURT
# CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| KEITH T. MARTIN, | ) Case No. EDCV 05-517-SJO (RNB) |
| Petitioner, | ) |
| | ) REPORT AND RECOMMENDATION |
| vs. | ) OF UNITED STATES MAGISTRATE |
| | ) JUDGE |
| W.J. SULLIVAN, Warden, | ) |
| | ) |
| Respondent. | ) |

This Report and Recommendation is submitted to the Honorable S. James Otero, United States District Judge, pursuant to the provisions of 28 U.S.C. § 636 and General Order 194 of the United States District Court for the Central District of California.

## PROCEEDINGS

On June 14, 2005, petitioner filed a Petition for Writ of Habeas Corpus by a Person in State Custody ("Pet.") herein. Following an extension of time granted by the then-assigned Magistrate Judge, respondent filed an Answer to Petition ("Ans."), accompanied by a supporting memorandum of points and authorities ("Ans. Mem.") on September 27, 2005. Following an extension of time, petitioner filed an Opposition to Respondent's Answer ("Reply"), along with a supporting memorandum

DOCKETED ON CM

APR 2 1 2006

BY                    040

1  of points and authorities ("Reply Mem.") on December 12, 2005.  The case was

2  transferred to this Court on March 20, 2006.

3       Thus, this matter now is ready for decision.

4

5  ## PROCEDURAL HISTORY

6       On November 9, 2001, a Riverside County Superior Court jury found petitioner

7  guilty of spousal abuse and simple assault.  (See Clerk's Transcript on Appeal ["CT"]

8  102-03, 114; 3 Reporter's Transcript on Appeal ["RT"] at 543-44).  At a bifurcated

9  proceeding held on November 14, 2001, petitioner admitted two prison priors within

10  the meaning of Cal. Penal Code § 667.5(b) and one prior strike within the meaning

11  of Cal. Penal Code §§ 1170.12(c) and 667(c) & (e) (California's Three Strikes Law).

12  (See CT 115; 3 RT 550-51).  At a sentencing hearing held on February 15, 2002, the

13  trial court sentenced petitioner to state prison for an aggregate determinate term of 8

14  years.  (See CT 155, 160; 3 RT 566).

15       Petitioner appealed his conviction and sentence to the California Court of

16  Appeal, raising claims generally corresponding to both portions of Ground 2 of the

17  Petition herein.[1]  (See respondent's Notice of Lodgment ("Lodgment"), Exh. 2).  In

18  an unpublished decision issued on April 23, 2003, the California Court of Appeal

19  rejected petitioner's claims and affirmed the judgment.  (See Lodgment, Exh. 3).

20  Petitioner then filed a Petition for Review to the California Supreme Court raising the

21  same claims.  (See Lodgment, Exh. 4).  The California Supreme Court summarily

22  denied the Petition for Review without comment or citation of authority on July 23,

23  2003.  (See Lodgment, Exh. 5).

24  ///

25

26  _____

27      [1]    Respondent's contention that petitioner did not raise the prosecutorial
misconduct portion of this claim on federal grounds in the state courts is addressed

28  infra at note 4.

2

1    Petitioner's first and only collateral challenge to his conviction took the form
2  of a pro per petition for writ of habeas corpus, filed in the California Supreme Court
3  on February 23, 2004. (See Lodgment, Exh. 6). Therein, petitioner raised a claim
4  generally corresponding to Ground 1 of the Petition herein. That habeas petition was
5  summarily denied without comment or citation of authority on February 16, 2005.
6  (See Lodgment, Exh. 7).
7    The filing of the instant Petition followed.
8
9              SUMMARY OF THE EVIDENCE PRESENTED AT TRIAL
10    Since petitioner is not contesting the sufficiency of the evidence to support the
11  conviction, the following summary is taken from the California Court of Appeal
12  opinion:

13              *At approximately 11:30 p.m. on May 4, 2001, sheriff's deputies*
14         *responded to a domestic violence call at a home in Perris. There, Deputy Moon*
15         *interviewed the victim, Kim Stoneham (Kim). Kim lived in the home with her*
16         *mother Mary, sister Robin, and other family members, including Kim's and*
17         *Robin's children.* [Petitioner] *did not live in the home, but had a relationship*
18         *with Kim that ended sometime before May 4.* [Petitioner] *and Kim have four*
19         *children together. On May 4, the children were ages two, three, six, and seven.*

20              *Deputy Moon testified at trial about statements Kim made to her on May*
21         *4, and about her physical injuries. Kim's face was bruised and her eyes were*
22         *swollen. She was shaking and crying and her breathing was erratic. Her*
23         *bottom lip was swollen and bleeding. She complained of pain in her left side,*
24         *left arm, and left leg. She had trouble standing. An ambulance was called, but*
25         *Kim refused to go to the hospital.*

26              *Kim told Deputy Moon that* [petitioner] *came to the home earlier that*
27         *evening to pick up their two youngest children.* [Petitioner] *and Kim left to go*
28         *to the store. On the way,* [petitioner] *parked next to a field and accused Kim of*

3

1   *seeing another man.* [Petitioner] *got out of the car, went to the passenger's*
2   *side, grabbed Kim by the hair, and forced her into the field.* [Petitioner] *pushed*
3   *Kim to the ground, sat on top of her, and began slapping her in the face. He*
4   *then began kicking her on the left arm and left leg. As he did so, he told her not*
5   *to move. This continued for what seemed to Kim to be about an hour.*

6        [Petitioner] *then told Kim he was going to leave her there and take the*
7   *children with him. Kim repeatedly asked* [petitioner] *to take her home.*
8   [Petitioner] *drove Kim to a street corner about two blocks from her house, and*
9   *told her he would be gone before the police arrived. Kim arrived home at*
10  *approximately 11:20 p.m. Deputy Moon noticed that Kim's clothing was dirty,*
11  *and that she had weeds and grass on her shirt.*

12       *Kim's sister Robin also testified for the prosecution. On May 4, Robin*
13  *was at home. She heard* [petitioner] *arrive in his car. Kim was outside with*
14  [petitioner] *for about 15 minutes. She then came into the house and told Robin*
15  *that she and* [petitioner] *were going to the store. They left between 8:30 and*
16  *9:00 p.m. About three hours later,* [petitioner] *returned alone.*

17       [Petitioner] *came into the house, and went into Kim's room. Robin asked*
18  *him where Kim was.* [Petitioner] *told Robin that Kim was at their sister*
19  *Lorraine's house. Robin called Lorraine, but Kim was not there.* [Petitioner]
20  *then said Kim was at the store and he was going back to get her.* [Petitioner]
21  *was in the house for about five minutes and then left.*

22       *Kim returned home about 20 minutes after* [petitioner] *left. Kim came to*
23  *the kitchen window and called Robin's name. Robin did not hear a car. Robin*
24  *found Kim outside. Robin said Kim was "all bloody and her face was all black*
25  *and big," and that she was upset and crying. Kim told Robin that she and*
26  [petitioner] *had a fight "over in some field," and* [petitioner] *beat her up. Kim*
27  *was also upset because* [petitioner] *had taken their two youngest children with*
28  *him.*

*Kim was subpoenaed to testify but failed to appear.  She was then arrested and taken to court.  Her testimony was inconsistent with her statements to Deputy Moon and her sister Robin.  She did not recall telling Deputy Moon or Robin that* [petitioner] *beat her up.  In fact, she denied being alone with* [petitioner] *at all on the night of May 4.*

*Instead, Kim testified that on May 4,* [petitioner] *and his girlfriend Sophia came to her house at approximately 10:30 or 11:30 p.m. to pick up the children.  She said she was drinking alone on the porch, and that* [petitioner] *said he was not going to bring the children back until she stopped drinking.*

*Kim said she argued with Sophia after Sophia "butted [into her] conversation" with* [petitioner]*.  She said she and Sophia got into "a little ruffle" and were fighting.  She said Sophia hit her on her face and right side.  She denied that* [petitioner] *hit her.  She said* [petitioner] *was a good father and helped with the children.*

*Kim did not mention Sophia to Deputy Moon or to Robin on May 4.  Robin did not see Sophia at the house that night, and did not hear anyone arguing or fighting outside.  Robin also said Kim was not outside drinking.  Deputy Moon did not smell alcohol on Kim's breath, and said that Kim did not appear to be under the influence of alcohol.  Kim admitted that she could have told one of her sisters that* [petitioner] *beat her, because she was angry.*

*Kim said she tried to contact Deputy Moon several times after May 4 to "get something straightened out because [she knew she had] been drinking and . . . wasn't in [her] right mind that night . . . ."  Robin said that after May 4,* [petitioner] *called Kim "a few times a day sometimes," and that Kim took the calls.*

*Sophia appeared in court on the first day of trial.  The prosecutor asked the court to appoint counsel to advise Sophia regarding her privilege against self-incrimination.  At the beginning of the defense case, Sophia was called to*

1    *the stand outside the jury's presence. She asserted her privilege against self-*
2    *incrimination and refused to answer any questions.* (Lodgment, Exh. 3 at 3-6).
3
4                          **PETITIONER'S CLAIMS**
5         1.    Appellate counsel rendered ineffective assistance when, on direct review,
6    he failed to raise the issue of trial counsel's ineffective assistance for failing to request
7    a mistrial based on prosecutorial misconduct and when he failed to raise the issue of
8    prosecutorial misconduct on federal grounds, in violation of the Sixth Amendment.
9    (See Pet. at 6, Attachment; Reply Mem. at 3-7).
10        2.    The trial court erred when it failed to give an instruction modeled on
11   CALJIC No. 2.25, and the prosecutor committed misconduct in commenting on a
12   defense witness's failure to testify when he knew the witness to be unavailable, in
13   violation of federal due process and equal protection. (See Pet. at 6; Reply Mem. at
14   2-3).
15
16                          **STANDARD OF REVIEW**
17        The standard of review applicable to petitioner's claims herein is set forth in 28
18   U.S.C. § 2254(d), as amended by the Antiterrorism and Effective Death Penalty Act
19   of 1996 ("AEDPA"):
20        "An application for a writ of habeas corpus on behalf of a person in
21        custody pursuant to the judgment of a State court shall not be granted
22        with respect to any claim that was adjudicated on the merits in State court
23        proceedings unless the adjudication of the claim--(1) resulted in a
24        decision that was contrary to, or involved an unreasonable application of,
25        clearly established Federal law, as determined by the Supreme Court of
26        the United States; or (2) resulted in a decision that was based on an
27        unreasonable determination of the facts in light of the evidence presented
28        in the State court proceedings."

6

1        Further, a state court factual determination must be presumed correct unless

2   rebutted by clear and convincing evidence. See 28 U.S.C. § 2254(e)(1) (as amended).

3        Under the AEDPA, the "clearly established Federal law" that controls federal

4   habeas review of state court decisions consists of holdings (as opposed to dicta) of

5   Supreme Court decisions "as of the time of the relevant state-court decision."

6   Williams v. Taylor, 529 U.S. 362, 412, 120 S. Ct. 1495, 146 L. Ed. 2d 389 (2000).

7        Although a particular state court decision may be both "contrary to" and "an

8   unreasonable application of" controlling Supreme Court law, the two phrases have

9   distinct meanings. See Williams, 529 U.S. at 391, 413. A state court decision is

10  "contrary to" clearly established federal law if the decision either applies a rule that

11  contradicts the governing Supreme Court law, or reaches a result that differs from the

12  result the Supreme Court reached on "materially indistinguishable" facts. See Early

13  v. Packer, 537 U.S. 3, 8, 123 S. Ct. 362, 154 L. Ed. 2d 263 (2002) (per curiam);

14  Williams, 529 U.S. at 405-06. When a state court decision adjudicating a claim is

15  contrary to controlling Supreme Court law, the reviewing federal habeas court is

16  "unconstrained by § 2254(d)(1)." Williams, 529 U.S. at 406. However, the state court

17  need not cite or even be aware of the controlling Supreme Court cases, "so long as

18  neither the reasoning nor the result of the state-court decision contradicts them."

19  Early, 537 U.S. at 8.

20       State court decisions that are not "contrary to" Supreme Court law may only be

21  set aside on federal habeas review "if they are not merely erroneous, but 'an

22  unreasonable application' of clearly established federal law, or are based on 'an

23  unreasonable determination of the facts.'" Early, 537 U.S. at 11 (citing 28 U.S.C.

24  § 2254(d) and adding emphasis). A state court decision that correctly identified the

25  governing legal rule may be rejected if it unreasonably applied the rule to the facts of

26  a particular case. See Williams, 529 U.S. at 406-10, 413 (e.g., the rejected decision

27  may state Strickland rule correctly but apply it unreasonably); Woodford v. Visciotti,

28  537 U.S. 19, 24-27, 123 S. Ct. 357, 154 L. Ed. 2d 279 (2002) (per curiam). However,

1  to obtain federal habeas relief for such an "unreasonable application," a petitioner
2  must show that the state court's application of Supreme Court law was "objectively
3  unreasonable." Woodford, 537 U.S. at 24-27; Williams, 529 U.S. at 413.  An
4  "unreasonable application" is different from an erroneous or incorrect one. See
5  Williams, 529 U.S. at 409-10; see also Woodford, 537 U.S. at 25; Bell v. Cone, 535
6  U.S. 685, 699, 122 S. Ct. 1843, 152 L. Ed. 2d 914 (2002).

7
8  **DISCUSSION**
9  **A.** **Habeas relief is not warranted with respect to petitioner's instructional**
10  **error claim.**

11      At trial, petitioner anticipated calling his girlfriend Sophia Richard to the stand.
12  The trial court ordered defense counsel to call her outside the presence of the jury due
13  to its concern that she might invoke her Fifth Amendment privilege against self-
14  incrimination and that the jury might draw impermissible inferences therefrom.  On
15  the advice of her counsel, Richard did invoke her Fifth Amendment privilege once on
16  the stand. (See 3 RT 435-37).  Defense counsel requested that the jury be instructed
17  that she had been called to testify outside the jury's presence and had invoked her
18  Fifth Amendment privilege.  The prosecutor argued that the jury was not allowed to
19  take that fact into consideration, so it should not be instructed to that effect. (See 2 RT
20  346-51; 3 RT 437-48).  After hearing further argument, the trial court declined to
21  instruct the jury that the witness had been called and had invoked her Fifth
22  Amendment privilege against self-incrimination, but did instruct the jury pursuant to
23  stipulation:

24      "The People and the defense stipulate that the defense subpoenaed and
25      called Sophia Richards - excuse me - Sophia Richard to testify in this
26      matter.  She was unavailable to testify in this matter.  You are not to
27      speculate as to the reason for her unavailability or as to what the content
28      of her testimony might have been." (See 3 RT 450).

8

1    Petitioner claims that the trial court erred in failing to give an instruction
2  modeled on CALJIC No. 2.25.[2]  (See Pet. at 6; Reply Mem. at 2-3).

3

4    1.    the California Court of Appeal decision

5    In rejecting this claim when petitioner raised it on direct review, the Court of
6  Appeal reasoned as follows[3]:

7        [Petitioner] *contends that the trial court erred by failing to give a*
8        *modified version of CALJIC No.2.25 regarding Sophia's unavailability or*
9        *failure to testify.  He now concedes he was not entitled to . . . an instruction*
10       *informing the jury that Sophia refused to testify because she invoked her*
11       *privilege against self-incrimination.*

12        *Nevertheless, he maintains that the trial court should have instructed the*
13       *jury not to draw any inferences based on Sophia's failure to testify, including*
14       *any inferences regarding (1) Sophia's credibility, (2)* [petitioner's] *guilt or*
15       *innocence, and (3) Kim's credibility.  He argues that he "impliedly requested"*
16       *such an instruction, modeled on CALJIC No. 2.25.  We reject this contention.*

17        *"Evidence Code section 913, subdivision (a) prohibits the trial court and*
18       *counsel from commenting on a witness's assertion of a privilege.  It further*

19  _____

20      [2]    CALJIC No. 2.25 provides: "When a witness refuses to testify to any
21  matter, relying on the constitutional privilege against self-incrimination, you must not
22  draw from the exercise of this privilege any inference as to the believability of the
23  witness [or] [whether the defendant is guilty] [or] [any other matter at issue in this
    trial]."  Its Use Note reads: "This cautionary instruction may also be used if the
24  privilege has been invoked and sustained in a pre-testimonial hearing in camera, and
25  the jury has become aware of that invocation."

26      [3]    Under Ylst v. Nunnemaker, 501 U.S. 797, 803-04, 111 S. Ct. 2590, 115
27  L. Ed. 2d 706 (1991), it may be presumed that the California Supreme Court, by its
    silent denial of petitioner's Petition for Review raising the same claim, did not intend
28  to change the lower court's reasoned decision rejecting it.

9

*provides that 'the trier of fact may not draw any inference [from the assertion of a privilege] as to the credibility of the witness or as to any matter at issue in the proceeding.' And Evidence Code section 913, subdivision (b) requires the court, at the request of an adversely affected party, to instruct the jury that it may not draw any inferences from the exercise of a privilege . . . ."* [Citation omitted.] *These statutes are reflected in CALJIC Nos. 2.25 and 2.26.*

*Under Evidence Code section 913, subdivision (b), a cautionary instruction is to be given at the request of a party only when "an unfavorable inference may be drawn by the jury because a privilege has been exercised . . . ."* [Citation omitted.] *It follows that if the jury does not know that a witness (or other holder) has exercised a privilege, it is not possible for any unfavorable inferences to be drawn. In such cases, no right or duty to give an instruction arises under Evidence Code section 913, subdivision (b). Accordingly, [petitioner] was not entitled to any instruction modeled on CALJIC No. 2.25.*

. . .

*Here, the record shows that [petitioner] did not request any cautionary instruction telling the jury not to draw inferences based on Sophia's failure to testify. Rather, [petitioner] proffered an instruction telling the jury that he called Sophia to the stand but she refused to testify based on her privilege against self-incrimination. As noted, [petitioner] now concedes he was not entitled to this instruction. The parties then stipulated that the trial court would instruct the jury not to speculate about why Sophia did not testify, or what her testimony might have been.*

*The record shows that [petitioner] had sound tactical reasons for not requesting a more specific cautionary instruction regarding Sophia's failure to testify. A specific cautionary instruction not to draw any inferences based on Sophia's failure to testify, including inferences regarding Sophia's or any other*

1    *witness's credibility, or [petitioner's] guilt or innocence, would have drawn the*

2    *jury's attention to the range of possible reasons for Sophia's silence. The jury*

3    *was as likely to speculate that Sophia failed to testify because she was innocent*

4    *and did not wish to perjure herself, as it was to speculate that she did not testify*

5    *because she was guilty and did not wish to incriminate herself.*

6          *Further, [petitioner] wanted the jury to know that Sophia did not testify*

7    *because she invoked her privilege against self-incrimination. Based on this*

8    *information, together with Kim's testimony exculpating [petitioner] and*

9    *inculpating Sophia, [petitioner] wanted the jury to speculate that Sophia also*

10   *would have incriminated herself and exculpated [petitioner]. A specific*

11   *cautionary instruction telling the jury <u>not</u> to draw <u>any</u> inferences regarding*

12   *Sophia's or Kim's credibility or [petitioner's] guilt or innocence would have*

13   *been inconsistent with this strategy.*

14         *In sum, [petitioner] was not entitled to a cautionary instruction modeled*

15   *on CALJIC No. 2.25, because the jury never became aware that Sophia invoked*

16   *her privilege against self-incrimination. Further, the stipulated instruction*

17   *adequately admonished the jury not to speculate about why Sophia did not*

18   *testify, or what her testimony may have been. And for sound tactical reasons,*

19   *[petitioner] did not request a more specific cautionary instruction, drawing the*

20   *jury's attention to the range of possible reasons why Sophia did not testify, or*

21   *what her testimony might have been.*

22         *Accordingly, the trial court did not err in failing to give an instruction*

23   *modeled on CALJIC No. 2.25, nor a more specific cautionary instruction*

24   *regarding Sophia's failure to testify.* (<u>See</u> Lodgment, Exh. 3 at 10-14).

25

26   2.    <u>Legal authority</u>

27         A state court's failure to give a particular jury instruction "'does not alone raise

28   a ground cognizable in a federal habeas corpus proceeding.'"  See <u>Dunckhurst v.</u>

1  <u>Deeds</u>, 859 F.2d 110, 114 (9th Cir. 1988); <u>see also</u> <u>Estelle v. McGuire</u>, 502 U.S. 62,
2  67-68, 112 S. Ct. 475, 116 L. Ed. 2d 385 (1991).  To merit federal habeas relief on a
3  claim that the trial court erred by omitting an instruction, petitioner must allege and
4  then show that the omission so infected the entire trial that the resulting conviction
5  violated his federal constitutional right to due process. <u>See</u> <u>Henderson v. Kibbe</u>, 431
6  U.S. 145, 154, 97 S. Ct. 1730, 52 L. Ed. 2d 203 (1977); <u>Cupp v. Naughten</u>, 414 U.S.
7  141, 147, 94 S. Ct. 396, 38 L. Ed. 2d 368 (1973); <u>Dunckhurst</u>, 859 F.2d at 114.
8  "Where the alleged error is the failure to give an instruction, the burden on the
9  petitioner is 'especially heavy.'" <u>Hendricks v. Vasquez</u>, 974 F.2d 1099, 1106 (9th Cir.
10 1992) (quoting <u>Henderson</u>, 431 U.S. at 155).

11

12      3.    <u>Analysis</u>

13      This Court is bound by the Court of Appeal's finding that, under California law,
14 petitioner was not entitled to an instruction modeled on CALJIC No. 2.25 where the
15 jury never learned that the witness invoked the Fifth Amendment privilege against
16 self-incrimination. <u>See</u> <u>Bradshaw v. Richey</u>, __ U.S. __, 126 S. Ct. 602, 604, 163 L.
17 Ed. 2d 407(2005); <u>Estelle</u>, 502 U.S. at 67-68.

18      Moreover, the Court concurs with the California Court of Appeal that the
19 stipulated instruction adequately admonished the jury not to speculate about why
20 Sophia did not testify, or what her testimony may have been.  The Court also concurs
21 with the Court of Appeal that what petitioner wanted the jury to do was improperly
22 speculate, based on Sophia's invocation of her privilege against self-incrimination, that
23 Sophia would have incriminated herself and exculpated petitioner.  A cautionary
24 instruction modeled on CALJIC No. 2.25 telling the jury not to draw any inferences
25 regarding Sophia's or Kim's credibility or petitioner's guilt or innocence would have
26 been inconsistent with that strategy.

27      The Court therefore finds that petitioner has not met his burden of showing that
28 the trial court's failure to instruct the jury pursuant to CALJIC No. 2.25, or a version

1 | thereof, so infected the entire trial that the resulting conviction violated federal due
2 | process. It follows that the California courts' rejection of this claim neither was
3 | contrary to nor involved an unreasonable application of clearly established federal law.

4

5 | **B.     Habeas relief is not warranted with respect to petitioner's prosecutorial**
6 |         **misconduct claim.**

7 |         Petitioner claims that the prosecutor committed misconduct when he commented
8 | about Sophia's failure to testify after she invoked the Fifth Amendment outside the
9 | presence of the jury.[4]  (See Pet. at 6; Reply Mem. at 2).  Specifically, petitioner
10 | challenges the following comments made by the prosecutor during rebuttal argument:

11 |         "Kim tried to derail the case by not coming to court, making the
12 |         prosecution prove a crime without a victim, making it a victimless crime.
13 |         . . . Second thing is she came to the court to lie. First, she's not going to
14 |         come to court. Second, she's going to come to lie. [¶] *Another thing is*
15 |         *[Sophia]. Did I miss something? Was I napping? I didn't see [Sophia]*
16 |         *up here.* " (See 3 RT 530) (Emphasis added.).

17

18 |         1.     the California Court of Appeal decision

19 |         In rejecting this prosecutorial misconduct claim when petitioner raised it on
20 | direct review, the Court of Appeal concluded that the prosecutor's comments were
21 | improper, but found no prejudice.  It reasoned, in pertinent part:

22 | _____

23 |         [4]     Respondent contends that petitioner's prosecutorial misconduct claim
24 | is unexhausted as he did not raise the issue on federal grounds before the California
25 | Supreme Court and instead simply "referr[ed] the California Supreme Court to his
   | opening brief in the court of appeal, which relied exclusively on state law grounds."
26 | (See Ans. Mem. at 4-7). The Court disagrees. In his Petition for Review, in addition
27 | to referring the state high court to his opening brief on appeal, petitioner explicitly
   | raised his prosecutorial misconduct claim as a "Federal Due Process" claim and cited
28 | to cases involving federal prosecutorial misconduct. (See Lodgment, Exh. 6).

1    *"Prosecutorial comment is reversible as misconduct under the federal*
2    *Constitution when it "'so infects the trial with unfairness as to make the*
3    *resulting conviction a denial of due process.'" [Citation.]  Under state law,*
4    *however, prosecutorial comment that falls short of rendering the trial*
5    *fundamentally unfair is misconduct when it involves """"the use of deceptive or*
6    *reprehensible methods to attempt to persuade either the court or the jury.""""*
7    *[Citation.]"* [Citation omitted.]  *Further, prosecutorial error is reversible*
8    *under state law only if it is "'reasonably probable that a result more favorable*
9    *to the defendant would have occurred had the district attorney refrained from*
10   *the comment . . . . '"* [Citation omitted.]  [¶] *"Additionally, when the claim*
11   *focuses upon comments made by the prosecutor before the jury, the question is*
12   *whether there is a reasonable likelihood that the jury construed or applied any*
13   *of the complained-of remarks in an objectionable fashion."* [Citation omitted.]
14   *"A jury will generally be presumed to have followed an admonition to*
15   *disregard improper evidence or comments, as '[i]t is only in the exceptional*
16   *case that "the improper subject matter is of such character that its effect . . .*
17   *cannot be removed by the court's admonitions." [Citation.]'"*  [Citation
18   omitted.]  [¶]  *We are not persuaded that the prosecutor's single, brief*
19   *reference to Sophia's failure to testify caused the jury to infer that she would*
20   *not have testified favorably to the defense.   The trial court immediately*
21   *instructed the jury to disregard the prosecutor's remark, and further instructed*
22   *the jury not to speculate about why Sophia did not testify, or what her testimony*
23   *might have been. It also instructed the jury that the attorneys' statements were*
24   *not evidence, and to follow the trial court's instructions on the law even if the*
25   *attorney's statements conflicted with the instructions. These instructions were*
26   *sufficient to cure any harm caused by the prosecutor's improper remark.*  [¶]
27   *Additionally, it is not reasonably probable that the prosecutor's remark*
28   *affected the jury's verdicts. Deputy Moon and Kim's sister Robin both testified*

14

1    *that Kim told them that* [petitioner] *caused her injuries. Both witnesses testified*

2    *that Kim never mentioned Sophia on the evening of May 4. Deputy Moon also*

3    *noticed that Kim had weeds and grass on her shirt, consistent with Kim's*

4    *original story that* [petitioner] *beat her in a field. And, the jury knew that Kim*

5    *was subpoenaed but failed to appear, and was arrested and taken to court."*

6    (See Lodgment, Exh. 3 at 14-6).

7

8    2.   <u>Legal authority</u>

9    In reviewing a habeas claim based on prosecutorial misconduct arising from

10  improper argument, "[t]he relevant question is whether the prosecutor's comments 'so

11  infected the trial with unfairness as to make the resulting conviction a denial of due

12  process.'" <u>Darden v. Wainwright</u>, 477 U.S. 168, 181, 106 S. Ct. 2464, 91 L. Ed. 2d

13  144 (1986). In determining whether a comment infected the trial with unfairness, the

14  court views the allegedly improper comments in the context of the entire trial. <u>See</u>

15  <u>Greer v. Miller</u>, 483 U.S. 756, 765-66, 107 S. Ct. 3102, 97 L. Ed. 2d 618 (1987); <u>Hall</u>

16  <u>v. Whitley</u>, 935 F.2d 164, 165 (9th Cir. 1991).

17

18    3.   <u>Analysis</u>

19    The Court construes the Court of Appeal's above finding as tantamount to a

20  finding of harmless error. The California Court of Appeal's usage of a harmless error

21  analysis was not contrary to clearly established federal law, as determined by the

22  United States Supreme Court.[5] Thus, under <u>Mitchell v. Esparza</u>, 540 U.S. 12, 18, 124

23

24          [5]    The Court has been unable to locate any Supreme Court case explicitly

25  addressing the issue of whether prosecutorial misconduct during closing argument is

26  subject to harmless error analysis. However, Ninth Circuit case law "may help

27  determine what law is clearly established," <u>see</u> <u>Van Tran v. Lindsey</u>, 212 F.3d 1143,

28  1154 (9th Cir.), <u>cert. denied</u>, 531 U.S. 944 (2000), and the Ninth Circuit has held that
                                                      (continued...)

1  S. Ct. 7, 12, 157 L. Ed. 2d 263 (2003), the sole determination for the Court is whether

2  the California Court of Appeal "applied harmless-error review in an 'objectively

3  unreasonable' manner." The Court finds that it did not.

4        The record reveals that defense counsel immediately objected to the improper

5  comments and a sidebar ensued. Immediately following the sidebar, the trial court

6  admonished the jury to disregard the prosecutor's comments regarding Sophia's failure

7  to testify. (See Lodgment, Exh. 3 at 15-6; 3 RT 530). As previously noted, the jury

8  also was separately instructed that, "the defense subpoenaed and called . . . Sophia

9  Richard to testify in this matter. She was unavailable to testify in this matter. You are

10 not to speculate as to the reason for her unavailability or as to what the content of her

11 testimony might have been." (See Lodgment, Exh. 3 at 16; 3 RT 450). The jurors are

12 presumed to have followed the instructions given to them, see Richardson v. Marsh,

13 481 U.S. 200, 211, 107 S. Ct. 1702, 95 L. Ed. 2d 176 (1987); Weeks v. Angelone, 528

14 U.S. 225, 234, 120 S. Ct. 727,145 L. Ed. 2d. 727 (2000), including curative or

15 cautionary instructions. See Williams v. Stewart, 2006 WL 770608, at *5 (March 26,

16 2006) (citing United States v. McCormac, 309 F.3d 623 626 (9th Cir. 2002)). Here,

17 petitioner has failed to adduce any evidence that the jury failed to follow the foregoing

18 instructions given by the trial court.

19       Moreover, the Court of Appeal's harmless error finding is not objectively

20 unreasonable in light of the other inculpatory evidence adduced against petitioner at

21 trial. Both Deputy Moon and Kim's sister Robin testified that Kim told them that

22 petitioner caused her injuries and that Kim never mentioned Sophia on the evening of

23

24 _____

25 (...continued)
   prosecutorial misconduct during closing argument is subject to a harmless error

26 analysis. See Allen v. Woodford, 395 F.3d 979, 1014 (9th Cir. 2005); see also

27 Thompson v. Borg, 74 F.3d 1571, 1577 (9th Cir.) (suggesting that if prosecutorial
   misconduct during closing argument constituted constitutional error, then court would

28 have to decide whether the error was harmless), cert. denied, 519 U.S. 889 (1996).

1  May 4th. (See Lodgment, Exh. 3 at 16; 2 RT 234-36, 238, 319-20, 324-25, 341-42).
2  Further, when Deputy Moon spoke with Kim on evening of the incident, she noticed
3  that her clothing was dirty and that there were weeds and grass on her shirt. This was
4  consistent with Kim's original story that petitioner beat her in a field. (See 2 RT 315,
5  358). Finally, the jury knew that Kim had been less than cooperative with the
6  prosecution: though subpoenaed, she failed to appear, and ultimately was arrested and
7  taken to court. (See 1 RT 146-47). Once on the stand, her testimony was wholly
8  inconsistent with her prior statements. She indicated that Sophia, not petitioner, had
9  caused her injuries when they got into "a little ruffle" outside the house. (See 1 RT
10 121, 133-38). Robin, however, who shared the house with Kim, did not see Sophia
11 at the house that night and did not hear any arguing or fighting outside. (See 2 RT
12 225-26, 236-37).

13       For the foregoing reasons, the Court finds and concludes that habeas relief is not
14 warranted with respect to petitioner's prosecutorial misconduct claim.

15

16 **C.    Habeas relief is not warranted with respect to petitioner's ineffective**
17       **assistance of appellate counsel claim(s).**

18       In Strickland v. Washington, 466 U.S. 668, 104 S. Ct. 2052, 80 L. Ed. 2d 674
19 (1984), the Supreme Court held that there are two components to an ineffective
20 assistance of counsel claim: "deficient performance" and "prejudice."

21       "Deficient performance" in this context means unreasonable representation
22 falling below professional norms prevailing at the time of trial. See Strickland, 466
23 U.S. at 688-89. To show "deficient performance," petitioner must overcome a "strong
24 presumption" that his lawyer "rendered adequate assistance and made all significant
25 decisions in the exercise of reasonable professional judgment." See 460 U.S. at 690.

26       The Strickland standard also applies to claims of ineffective assistance of
27 appellate counsel based on the failure of appellate counsel to raise particular claims
28 on appeal. See Smith v. Robbins, 528 U.S. 259, 285, 120 S. Ct. 746, 145 L. Ed. 2d

756 (2000). A habeas petitioner must show that, but for appellate counsel's objectively unreasonable failure to raise the omitted claim(s), there is a reasonable probability that petitioner would have prevailed on appeal. "A reasonable probability is a probability sufficient to undermine confidence in the outcome." Strickland, 466 U.S. at 694. In the absence of such a showing, neither Strickland prong is satisfied. See Pollard v. White, 119 F.3d 1430, 1435-37 (9th Cir. 1997); Miller v. Keeney, 882 F.2d 1428, 1434-35 (9th Cir. 1989).

Here, petitioner claims that his appellate counsel rendered ineffective assistance on direct review when he failed to raise the issue of trial counsel's ineffective assistance for failing to request a mistrial based on prosecutorial misconduct. (See Pet. at 6, Attachment; Reply Mem. at 3-7). The record reflects, however, that trial counsel did immediately object to the prosecutor's comments during rebuttal argument; and that, after a sidebar, the trial court instructed the jury to disregard the comments. The Court of Appeal found that the curative instruction given after the prosecutor's remark and the instruction given to the jury not to speculate about why Sophia did not testify "were sufficient to cure any harm caused by the prosecutor's improper remark"; and that, in light of the evidence presented at trial, it was "not reasonably probable that the prosecutor's remark affected the jury's verdicts." (See Lodgment, Exh. 3 at 16). Given these findings, petitioner has failed to convince the Court that, but for appellate counsel's failure to raise the claim that trial counsel was ineffective for failing to request a mistrial based on prosecutorial misconduct, there is a reasonable probability that petitioner would have prevailed on appeal.

Petitioner also claims that appellate counsel rendered ineffective assistance when he failed to raise the issue of prosecutorial misconduct under both state and federal standards. (See Reply Mem. at 5-6). The record reflects that the California Court of Appeal explicitly acknowledged the standard for reversing a conviction under the Federal Constitution due to prosecutorial misconduct and noted that "[u]nder state law, however, prosecutorial comment that falls short of rendering the trial

1  fundamentally unfair is . . . reversible . . . only if it is "'reasonably probable that a
2  result more favorable to the defendant would have occurred had the district attorney
3  refrained from the comment. . . . '" (See Lodgment, Exh. 3 at 15). The appellate court
4  then applied the state standard in rejecting petitioner's claim on harmless error
5  grounds. Arguably, the foregoing passage represents an implicit finding by the Court
6  of Appeal that the alleged prosecutorial misconduct did not render the trial
7  fundamentally unfair. In any event, the same reasons cited by the Court of Appeal in
8  support of its finding of harmless error under state law support a finding that, when
9  viewed in the context of the entire trial, the prosecutorial misconduct did not so infect
10  the trial with unfairness as to make the resulting conviction a denial of due process.
11  Thus, petitioner has failed to convince the Court that, but for appellate counsel's
12  failure to explicitly raise the prosecutorial misconduct claim on federal grounds, there
13  is a reasonable probability that petitioner would have prevailed on appeal.

14       Accordingly, the Court finds and concludes that the California Supreme Court's
15  rejection of petitioner's ineffective assistance of appellate counsel claim(s) neither was
16  contrary to nor involved an unreasonable application of clearly established federal law.

17

18                        **RECOMMENDATION**

19       IT THEREFORE IS RECOMMENDED that the District Court issue an Order:
20  (1) approving and adopting this Report and Recommendation; and (2) directing that
21  Judgment be entered denying the Petition and dismissing this action with prejudice.

22

23  DATED:     April 20, 2006

24

25

26                      ROBERT N. BLOCK
                    UNITED STATES MAGISTRATE JUDGE

27

28